# EXHIBITS A TO G

# EXHIBIT A – 2ND AMENDED COMPLAINT

Jerry V. Leaphart #JL4468
Jerry V. Leaphart & Assoc., P.C.
8 West Street, Suite 203
Danbury, CT 06810
(203) 825-6265 – phone
(203) 825-6256 – fax
jsleaphart@cs.com

## UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| EDWARD F. HAAS, Individually, and on behalf of others similarly situated, | : : : : | ECF CASE |
| Plaintiff, | : : | DOCKET No. 07 CIV 3623 (GBD) |
| vs. | : : : | |
| CARLOS M. GUTIERREZ, Secretary, U.S. Department of Commerce; WILLIAM A. JEFFREY, Director, National Institute of Standards and Technology (NIST); DR. SHYAM SUNDER, Lead Investigator of NIST, WTC Investigation; DR. THERESA McALLISTER, Research Structural Engineer, NIST; CATHERINE FLETCHER, Chief, Management and Organizational Division, National Institute of Standards and Technology | : : : : : : : : : : : : : : : : | **SECOND AMENDED COMPLAINT INJUNCTIVE AND DECLARATORY RELIEF, ATTORNEY'S FEES, COSTS OF SUIT PER BIVENS v. SIX UNKNOWN AGENTS, 403 U.S. 388, 390-97 (1971) AND ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 551 et seq. and 5 U.S.C. § 701 et seq.**<br><br>December 18, 2007 |

2

(NIST);                                    :
                                           :
                    Defendants.    :


I.

Nature of Action

1.       This action is brought pursuant to (a) <u>Bivens v. Six Unknown Agents</u>, 403

U.S. 388, 390-97 (1971) (<u>Bivens</u>), for (i) violations and thre0atened violations of the

plaintiff's rights to Due Process under the Fifth Amendment to the United States

Constitution; and (ii) violations and threatened violations of the plaintiff's rights pursuant

to the Administrative Procedure Act, 5 U.S.C. § 551 et seq. ("APA"); and (iii) in

furtherance of plaintiff's rights to seek administrative review, including that of injunctive

relief and/or a delay in conducting further challenged administrative agency action as per

5 U.S.C. § 701 et seq.

2.       Plaintiff has submitted a Request for Correction (RFC) under and pursuant

to the Data Quality Act (DQA), per Section 515 of Public Law 106-554, which said RFC

has been pending within that certain department of the United States Department of

Commerce known as the National Institute for Standards and Technology (NIST), from

on or about February 28, 2007 through and including the present a period of time that

exceeds sixty (60) days.  However, on or about  August 8, 2007, NIST issued its response

to plaintiff's said RFC that contained admissions of controlled demolition of WTC7 by

way of the statement of Larry Silverstein, but NIST has knowingly misconstrued that

statement and sought to discount it as evidence of controlled demolition, but has done so

on the plainly improper basis of allowing the statement to be deemed to be "refuted", not by the declarant himself, but by a "spokesman" for the declarant. In so doing, NIST has not only shown that it is engaging in fraud and deceit, it is plainly misconstruing the legal effect of the statement it knows to have been made by Larry Silverstein and the purported refutation of it. At most, and for purposes of "evidence" it is clear that the original statement that WTC7 was "pulled" meaning it was intentionally destroyed by way of controlled demolition is not "refuted" in the sense of being made to disappear from existence as evidenced by a subsequent attempt at refutation. At most, the subsequent attempt at refutation serves to turn the original statement into a "prior inconsistent statement" which, remains, of course, as a form of evidence to be resolved by an appropriate trier of fact.

Thus, the factual basis clearly exists for plaintiff's valid assertion of a multi-pronged cause of action.

3.    Per the published Rules and Regulations found at

http://www.nist.gov/director/quality_standards.htm, plaintiff should have been informed as follows:

"3.    The division Chief will communicate his/her initial decision or the status of the request through the NIST OU Deputy Director to the Chief, NIST Management and Organization Division, who will communicate the initial decision to the requester, usually with 60 calendar days of NIST's receipt of the request.

4. The initial decision or status update will contain the name and title of the Division Chief and a notice that the requester may appeal an initial denial to the NIST Deputy Director (with the name, title, and address of that official), pursuant to paragraph III.D.1. below, within 30 calendar days of the date of the initial denial." (Excerpted from National Institute of Standards and Technology Guidelines, Information Quality Standards, and Administrative Mechanism)

4

4.      NIST has published information indicating it is working on finalizing a report on what caused the 6.6 second collapse of World Trade Center building number 7 (WTC7), which building was seen in video to have been destroyed, from tippity top to utter bottom, via live video taped television programming, in the said 6.6 second time interval occurring at approximately 5:20 PM on September 11, 2001.  As of that date and time, WTC7 joined the 110-story World Trade Center Twin Towers, that had been known as World Trade Center building 1 (WTC1) and World Trade Center building 2 (WTC2), respectively, for address purposes, as the only three steel-reinforced skyscrapers ever to have self-destructed, from top to bottom, in a matter of mere seconds; except, that is, such structures as had been intentionally demolished by way of controlled demolition procedures and/or destruction resulting from warfare or military means.  Moreover, even as to such structures, the previous world's record height for even the controlled demolition of a building was only 439 feet, the height of the 25-story J. L. Hudson department store building in Detroit, MI.  See:  http://www.infoplease.com/askeds/tallest-building-demolished.html

> "According to the Guinness Book of World Records, the tallest building demolished by explosives was the former J. L. Hudson Department Store in Detroit, MI.  It stood at 439 feet when it was imploded on October 24, 1998."

Note, too, that controlled demolitions are not foregone conclusions and they are not easy to accomplish.  The higher the building is, the more likely it is that something will go awry.  With respect to the J. L. Hudson building, we are told:

> "Complicating the implosion, engineered by Controlled Demolition Inc. (CDI) of Phoenix, MD, was the fact that construction of the building occurred in 12 stages between 1911-46 and no structural drawings of the building existed.

But the record-setting implosion went off without a hitch.  The roughly 2,728 lbs. of explosives placed inside the building reduced it to piles of debris in a matter of seconds."

Thus the implications here are clear:  On 9/11/01 not one, not two, but three, modern, steel-reinforced skyscrapers fell into their own foot-prints in nearly perfect, controlled demolition-like fashion.  Each one far exceeded the previous world-record heights for a controlled demolition…

The focus herein is WTC7.  The observed demolition of that building demonstrated a near text-book quality demolition as per what the naked eye could see.  Yet, after all this time, NIST has neither issued a report nor even responded to plaintiff's RFC.  The elements of deprivation of right are clear and apparent, justifying the injunctive relief here sought.  For the record, WTC7 stood 570 feet in height and was 47 stories.  It was, then, significantly taller, with nearly double the number of floors in comparison with Hudson's.

5.     It was not until in or about the month of September, 2005, that NIST issued a final report on what it alleged caused the "initiation" of what it called the "collapse" of WTC1,2.  NIST's said report is commonly known as and referred to as NCSTAR 1 and can be accessed at: http://wtc.nist.gov/reports_october05.htm.

6.     To this day, NIST has not yet issued any report on what caused the 6.6 second destruction of WTC7, but has issued certain interim public statements confirming that it is in the process of working on issuing a report on what caused the destruction of WTC7.  As of this date, December 18, 2007, NIST has indicated, in words or substance, that it still is not in a position to issue a report on what caused the destruction of WTC7.

7.    In or about the month of October, 2006, approximately (6) months ago, NIST, for the first time, issued a publicized report that it is to consider "hypothetical blast events" as a possible causal factor in the destruction of WTC7.  Said publicly disseminated information can be found at

http://wtc.nist.gov/media/WTC7_Approach_Summary12Dec06.pdf

8.    The summary found at the link listed above in paragraph 7. states at pg. 11 thereof a materially false statement to wit:  "While NIST has found no evidence of a blast or controlled demolition event, NIST will estimate the magnitude of hypothetical blast scenarios…".  That statement is materially false because it stands in clear, palpable, direct and blatant contradiction of the statement acknowledging and admitting that WTC7 was felled by controlled demolition which statement was made by Larry Silverstein, a principal of defendant Silverstein Properties, in a publicly disseminated video statement airing on the US Public Broadcasting System, in which Larry Silverstein stated, and we quote him verbatim:

> "I remember getting a call from the er, fire department commander, telling me that they were not sure they were gonna be able to contain the fire, and I said, 'We've had such terrible loss of life, maybe the smartest thing to do is pull it.' And they made that decision to pull and we watched the building collapse."

As Silverstein Properties is or was a consultant for NIST under and pursuant to the preparation of NCSTAR 1, it is utterly incongruent, inconsistent and incomplete for NIST to declare it has no evidence of controlled demolition when, in fact, it has actively consulted with a party who has admitted just that.  In addition, said admission, and NIST's misleading and fraudulent declaration that it has no evidence of controlled demolition, confirms the existence of a clear and palpable conflict of interest mandating the injunction here sought.

9.      Plaintiff's RFC goes to the essence of the defendant, NIST's improper lack of treatment of the issue of controlled demolition with respect to WTC7.

10.      Based on the amount of time that has already elapsed since the 6.6 second top to bottom destruction of WTC7 on the afternoon of September 11, 2001, it is acknowledged that it is in the public interest to have a report on that event issued. However, the same could be said for anytime after, roughly, 90 days from the event itself in that one can safely assert that 90 days should have been a reasonable time to issue an official report on an event that is both as important and as anomalous as is the complete and utter destruction of a skyscraper in a matter of seconds where such skyscraper had not been hit by either an acknowledged bomb or by an apparent jetliner or by anything else.  Yet it fell right straight down, looking for all the world to see, like a controlled demolition.  It should not take any competent group of investigators six (6) years to determine the destruction of WTC7 was a controlled demolition.  Yet, despite the interest and the urgency in needing to know how on earth such an event could have happened, promptly, we are now nearly six (6) years' time from the event and it is only with the last one-hundred-twenty (120) days, or so, that NIST has even acknowledged it might need to look into "hypothetical blast events".  Based upon the confirmed and verifiable facts here asserted, a delay in the further processing, by NIST, of analytical work pending resolution of plaintiff's RFC is plainly meritorious and just.  Plaintiff's RFC alleges the existence of conflicts of interest and other elements found that may be dispositive of a) why it has taken so long; b) why the obvious evidence of controlled demolition has been: i) hidden; ii) ignored; and iii) downplayed.

11.     Annexed hereto as Exhibit A is a copy of plaintiff's RFC, appended to a request for negotiations addressed to NIST's Deputy Chief Counsel for Technology, Attorney Melissa Lieberman, that sought negotiations for forbearance of further work done on analyzing what caused the 6.6 second destruction of WTC7 pending outcome of plaintiff's RFC.

12.     Annexed hereto as Exhibit B is a copy of NIST response to plaintiff dated August 22, 2007 (NIST RFC Response).

13.     In any event, and as indicated, Deputy Chief Counsel Lieberman has not responded to the request for negotiations heretofore submitted with respect to forbearance on further assessment by NIST of what caused the near instantaneous destruction of WTC7.

14.     Based upon all of the foregoing, plaintiff herein asserts that:

15.     The Fifth Amendment's Due Process clause requires notice and the opportunity to be heard before NIST can continue to proceed on its investigation of what caused the near-instantaneous destruction of WTC7 because of NIST's attempt to improperly exclude evidence of controlled demolition that it obviously had and that it has admitted to have in the RFC  Response to plaintiff (Exhibit B).

16.     The NIST RFCX is in violation of the APA's procedural requirements, and is arbitrary, capricious, and unreasonable in the circumstances here presented and is an abuse of discretion and otherwise not in accordance with law.

17.     In the DQA (also known as the IQA), Congress established a federal scheme that

regulates the requirements and standards that information promulgated by agencies of the

government of the United States, "Federal Agencies" must adhere to in order to assure

that such information comports with quality standards.  When such information is

deemed as "influential information" the requirements for meeting quality standards are

higher than they otherwise would be.  It is here asserted that the information that is to

result from the analysis of what caused the near-instantaneous destruction of WTC7 will

be deemed, under the DQA, to be "influential information."  Thus, plaintiff's RFC that

alleges certain well-documented particulars as to how and why the information thus far

released with respect to the investigation of WTC is internally inconsistent and fraught

with obvious indicators of unlawful conflict of interest, all as more fully elaborated in

Exhibit A, clearly mandates the relief to be requested herein.

      18.    The claims in this complaint are cognizable under <u>Bivens</u> and the APA.

Indeed, the refutation of evidence that NIST sought to rely on is deceptive.  The NIST

RFC Response states in relevant part as follows:

> "Your further assertion that Larry Silverstein indicated that a decision was made
> to demolish WTC 7 has been previously refuted by his spokesman on September
> 9, 2005…"

In response to the quoted statement found under the segment "Correction Request 2" of

Exhibit C, (pg. 3 of 4), plaintiff asserts that the quoted statement cannot serve to counter

the assertion that there is evidence of controlled demolition of WTC 7, making the

contrary assertions contained in several of the publications of NIST, for which defendants

are responsible, plainly false.

      It is worth reiterating that to plaintiff's knowledge, there is only one source of the

information that NIST considers the "pull it" statement of Larry Silverstein to have been

refuted by the subsequent statement of a "spokesperson" and that source is, in fact, the

NIST RFC Response (Exhibit B), making plaintiff, in point of fact, the only person who

has standing to bring a cause of action seeking declaratory and injunctive relief and

asserting due process violations and violations arising under the APA.  As noted the

NIST RFC Response is annexed hereto as Exhibit B.

Annexed hereto as Exhibit C is the source information confirming deception and the

manifested intent to exclude evidence of controlled demolition of WTC 7.

II.

Parties

19.     Plaintiff, Edward F. Haas, ["EFHaas"] is a United States citizen and a

resident of the State of South Carolina.

20.     Defendant Carlos M. Gutierrez is the Secretary of Commerce of the

United States. He is sued here in his individual and official capacity for the purpose of

obtaining declaratory and injunctive relief.

21.     Defendant William A. Jeffrey is the Director of the National Institute of

Standards and Technology (as aforesaid, "NIST"). In that role, he is responsible for

exercising the authority delegated by the Secretary of Commerce to enforce the DQA. He

is sued here in his individual and official capacity for the purpose of obtaining

declaratory and injunctive relief.

22.     Defendant Dr. Shyam Sunder is the Lead Investigator of the team

designated to and charged with determining what caused the near-instantaneous

destruction of WTC7.  As such, he is charged with conducting, and is authorized to direct

the processes and procedures for and on behalf of NIST is furtherance of the WTC7

investigation. He is sued here in his individual and official capacity for the purpose of obtaining declaratory and injunctive relief.

23.     Defendant Dr. Theresa McAllister is employed by NIST   as a Research Structural Engineer and who is known to have responsibilities directly related to performance of work and tasks in furtherance of NIST's attempt to determine what caused the near-instantaneous destruction of WTC7, such as the first-time announcement made in or about the month of October 2006, that NIST would then investigate the possibility of "hypothetical blast events" as being causal of the near-instantaneous destruction of WTC7. Accordingly, Dr. McAllister appears to have significant responsibility for overseeing the work done in furtherance of the WTC7 investigation. She is sued here in her individual and official capacity for the purpose of obtaining declaratory and injunctive relief.

24.     Defendant Catherine Fletcher is the Chief, Management and Organization Division of NIST charged with the acknowledgment of RFCs to the sender of said RFCs. She is sued here in her individual and official capacity for the purpose of obtaining declaratory and injunctive relief.

25.     The defendants are acting, and each of them at all times relevant hereto were acting, in their respective official capacities with respect to all acts described herein, and were in each instance acting under the color and authority of federal law. Upon information and belief, unless preliminarily and permanently enjoined, the defendants, and each of them, intend to act in their

respective official capacities and under the authority of federal law in carrying out the

ongoing investigation of the destruction of WTC7, in violation of the plaintiff's

constitutional and statutory rights.

III.

Jurisdiction and Venue

26.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331,

in that it arises under the Constitution and laws of the United States; Bivens, 403 U.S. at

390-97, in that it seeks to secure prospective, equitable relief directly under the

Constitution, specifically the Fifth Amendment; under 28 U.S.C. § 2201(a), in that one

purpose of this action is to secure declaratory relief; and under 28 U.S.C. § 2202, in that

one purpose of this action is to secure preliminary and permanent injunctive relief.

Judicial review of the agency action at issue is authorized by the APA, 5 U.S.C. §§ 702,

704 and 706.

27.     This Court has venue under 28 U.S.C. § 1391(b)(2), in that a substantial

part of the events giving rise to the claims made herein – i.e., the location of the building

destroyed on September 11, 2001, namely, WTC7, took place in this District.

Alternatively, this Court has venue under 28 U.S.C. § 1391(b)(3) because at least one of the

defendants maintains an office in New York City.

IV.

Facts

28.     The plaintiff incorporates by reference all facts and allegations contained

in paragraphs 1 through 31.

29.    The plaintiff filed an RFC under the DQA on or about February 28, 2007. To date, there has been no reply or other acknowledgment by defendants or anyone acting on their behalf of receipt of plaintiff's said RFC.

30.    The defendants likewise rejected, by non-responsiveness, plaintiff's request for negotiations for forbearance that plaintiff had submitted on or about March 2, 2007, as per Exhibit B.

31.    On information and belief, the defendants and/or their agents may wish to continue disregarding plaintiff's RFC with the intent to issue a report on the destruction of WTC7 based on continued adherence to the flawed premises and with the existing conflicts of interest, irrespective of plaintiff having now called attention to them, all as more fully articulated in Exhibit A hereof.

V.

Exhaustion of Remedies

32.    Plaintiff EFHaas has exhausted his administrative remedies, having filed an RFC with NIST, in compliance with the DQA, challenging certain specific aspects of disseminated information and having made specific requests for relief that are presently pending, and which have been acted upon by way of a response dated August 22, 2007 (Exhibit B) that contains admissions of actionable wrongdoing cognizable under the APA and/or Bivens.  Moreover, the harm has been reiterated as of December 18, 2007, the date hereof, in a webcast presentation by NIST wherein and whereby continued deception has been approved in that the evidence of controlled demolition of WTC7 is still being denied, hidden and otherwise not acknowledged.  Plaintiff further states that having received a reply, Exhibit B, he exhausted his administrative remedy as he was not obliged

to appeal that determination.  Moreover, the right of appeal afforded by NIST is useless because, by the terms thereof, "no opportunity for personal appearance, oral argument, or hearing on appeal is provided."  Absent a temporary order that would permit a determination of rights and of responsibilities in the present and before any further harm can be done; in other words, for prospective injunctive relief, plaintiff's rights as asserted hereunder would be rendered unreasonable.

VI.

First Claim: Violation of Administrative Procedure Act –
Ultra Vires Agency Action

33.    Plaintiff incorporates by reference the allegations of paragraphs 1 through 36.

34.    Under § 706(2)(c) of the Administrative Procedure Act, a reviewing court must set aside any agency action that is "in excess of statutory jurisdiction, authority, or limitations . . ." 5 U.S.C. § 706(2)(c).

35.    The regulations promulgated by the defendants to implement the DQA would be rendered moot in the absence of an agreed upon format for forbearance pending the completion of the RFC process presently pending before NIST.  Indeed, in the absence of such procedure for obtaining forbearance, it is clear that the DQA procedures currently followed by NIST are, were promulgated without any "statutory jurisdiction, authority, or limitations," and must therefore be set aside. 5 U.S.C. § 706(2)(c).

VII.

Second Claim: Violation of Administrative Procedure Act –
Agency Action That Is Arbitrary, Capricious, An Abuse Of
Discretion And Otherwise Not In Accordance With Law
In Promulgating DQA Regulations.

15

36. Plaintiff incorporates by reference the allegations of paragraphs 1 through 39.

37.    The APA imposes upon the defendants a number of nondiscretionary duties regarding rulemaking procedures. 5 U.S.C. § 553. The APA requires a federal agency to provide adequate notice to the public regarding the nature, scope and effects of any proposed or final agency action. The APA also requires that the federal agency provide the public with a full and fair opportunity to comment regarding any proposed agency action.  Based upon the filing of his RFC on February 28, 2007, it is clear that even though he has done so, the absence of an agreement for forbearance by NIST pending the outcome of that RFC would render his having filed it moot. The defendants have failed to respond adequately – or at all – to plaintiff's request to be heard on the issue of forbearance.

38.    The APA also requires a federal agency to fully articulate its basis and reasons regarding any final agency action. The defendants have failed to explain adequately the basis and reason(s) for not responding to plaintiff's request for negotiations concerning procedures pending the determination of plaintiff's RFC.

39.        The defendants' failure to comply with the APA's procedural requirements was arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law. Therefore, in refusing to either negotiate with plaintiff concerning forbearance during the pendency of plaintiff's RFC, the defendants violated the APA, and their actions must be set aside.

VIII.

Third Claim: Violation of Administrative Procedure Act –
Arbitrary And Capricious Failure To Abide
By The Standards

40.    Plaintiff incorporates by reference the allegations of paragraphs 1 through 43.

41.    Now that plaintiff has filed an RFC, and received a reply containing admissions of deception and wrongdoing, there exists both actionable harm and standing on the part of plaintiff to pursue this cause of action.

42.    Regulations promulgated by NIST and/or the defendant U.S. Department of Commerce simply do not permit for a meaningful consideration of RFC's in the absence of any procedure allowing for either mandatory or permissible forbearance from action pending the outcome of submitted RFCs.

IX.

Prayer for Relief

43. An order to prevent the defendants from violating the plaintiffs' rights under the Fifth Amendment to the United States Constitution and the Administrative Procedure Act, the plaintiff requests that this Court grant preliminary and permanent injunctive relief barring the defendants from engaging in either all or some specifically designated portions of work on determining the causes of the near-instantaneous destruction of WTC7, until the outcome of plaintiff's presently pending RFC is known.

44.    The plaintiff is entitled to a preliminary injunction barring the defendants from engaging in certain additional work on determining the causes of destruction of WTC7 because:

(a) there is a significant likelihood that the plaintiff will prevail on the merits;

(b) the plaintiff will suffer irreparable harm if his RFC is allowed to languish while ongoing work on determining the causes of the destruction continue despite his having raised the serious concerns that he has raised that show how and in what manner that investigation is imperiled;

(c) there is a compelling public interest in ensuring that persons charged with engaging in work for and on behalf of the public not be allowed to steer investigations in a manner so as to produce a false, fraudulent and/or misleading outcome, as will almost certainly happen unless this Court requires that defendants cease and desist from certain designated activities in furtherance of the ongoing WTC7 investigation pending the outcome of plaintiff's presently pending RFC.

45.    Plaintiff further request that this Court grant declaratory relief by issuing an Order declaring that the defendants' current means, methods, practices, procedures, and customs regarding procedures under the DQA violate the Fifth Amendment to the United States Constitution, and the

Administrative Procedure Act.

46.    Plaintiff requests that this Court grant reasonable attorney fees pursuant to 42 U.S.C. § 1988 and the laws of the United States.

47.     Plaintiff requests that the Court grant such further relief as it deems just
and proper.


THE PLAINTIFF

By_____
Jerry V. Leaphart JL4468
JERRY V. LEAPHART & ASSOC., P.C.
8 West Street, Suite 203
Danbury, CT 06810
(203) 825-6265 - phone
Dated:  Danbury, CT                    (203) 825-6256 - fax
        May 9, 2007                    jsleaphart@cs.com

# EXHIBIT B



# EXHIBIT C
# REQUEST FOR CORRECTION 3/1/07

Effort to halt government WTC7 investigation launched

March 1, 2007 – The following Request for Correction was e-mailed to the National Institute of Standards and Technology on February 28, 2007.  It will be certified mailed on March 1, 2007.  Attorney Jerry Leaphart has informed me that he will work on the legal papers for an injunction this weekend.

The subject matter within this Request for Correction and pending filing for injunction is purposeful.  The reader might be tempted to conclude that many other contradictions found within the government investigation of WTC1, WTC2, and WTC7 should have been referenced in this Request for Correction.  I can assure you that great thought went into this effort and it mirrors the advice of counsel.  What some might conclude as "too narrow" is actually advantageous to achieving the goal – the truth.

 Please support the Muckraker Report in this effort.

February 28, 2007

<u>VIA EMAIL AND CERTIFIED MAIL RRR</u>

Chief, Management and Organization Division
National Institute of Standards and Technology
100 Bureau Drive, Mail Stop 3220
Gaithersburg, MD 20899-3220
Email: info.quality@nist.gov

Re:  Requests for Correction per Section 515 of Public Law 106-554

**Dear Chief, Management and Organization Division**:

This is a matter involving the "information" that has been "disseminated" that serves a useful purpose of making sure that the ongoing investigation of what caused the destruction of World Trade Center building number 7 (WTC7) complies with data and information quality standards.  For all of the reasons set forth below in conjunction with specific requests for correction, such standards are in significant danger of being utterly and completely violated.

This request is submitted by Edward F. Haas (requester).  My address, telephone number and email address are as set forth above.  In addition, Attorney Jerry V. Leaphart represents me in this matter.  I request that all subsequent replies be sent to both me and to my counsel whose contact information is set forth below.

The requests for correction of information submitted hereunder are submitted under Section 515 of Public Law 106-554.

 The particular information disseminated that is the subject of the request consists in:


CORRECTION REQUEST ISSUE 1


The information is identified and known as  "Federal Building and Fire Safety Investigation of the World Trade Center Disaster WTC 7 Technical Approach and Status Summary" and is dated as December 12, 2006. (Information Item No. 1)


The source from which requester obtained the information is the NIST web site at the following page: http://wtc.nist.gov/media/WTC7_Approach_Summary12Dec06.pdf


Requester obtained the information from and after December 12, 2006 from the said web page.  It is understood and acknowledged that said information has been disseminated so as to provide a status of an ongoing investigation, and that said investigation is seriously imperiled by the incorporation of information that requires, at a minimum, the corrections set forth and requested hereunder.

Requester submits this request on behalf of himself and other similarly situated persons.  Requester is a citizen of the United States and maintains a web site for the accurate dissemination and propagation of governmental information. Requester's business is in the nature of a research and journalistic organization that has succeeded in providing citizens of the United States with timely information concerning the function and the operation of various governmental agencies that are charged by their enabling legislation, rules and regulations of conducting certain duties in and for the public interest, of which and about which each citizen has a vital interest.

As indicated, this request is to be understood as being submitted by requester in his said capacity and either additionally or alternatively on behalf of other similarly situated persons who are too numerous to quantify or specifically name. Requester is adversely affected by the ongoing threat of promulgation of information that is in need of correction because the present course of action may result in the further concealment of serious wrongdoing.

Specifically, Information Item No. 1 fails to comply with applicable information quality guidelines and standards in a number of particular ways, including, but not limited to inclusion of the following demonstrably false statement found at page 11 of Information Item No. 1:

**"NIST is analyzing scenarios for the event that initiated the collapse of WTC 7. As a part of this work, NIST is considering whether hypothetical blast events could have played a role in initiating the collapse. While NIST has found no evidence of a blast or controlled demolition event, NIST will estimate the magnitude of hypothetical blast scenarios that could have led to the structural failure of one or more critical elements as a result of blast."** (Bold emphasis added)

Requester asserts that the quoted information is demonstrably false and misleading and must be corrected, together with other information that, at present, also contains false and misleading statements.  Said information is false in and as a result of the following particulars:

NIST's NCSTSAR 1 report, issued in or about the month of October 2005, contains the following statement that must be deemed applicable to the ongoing investigation of what caused the 6.6-second destruction of WTC building 7 and to Information Item No. 1:

**"NIST found no corroborating evidence for alternative hypotheses suggesting that the WTC towers were brought down by controlled demolition using explosives planted prior to September 11, 2001."** (Bold emphasis added)

It is to be noted that NCSTAR 1 repeats the above quoted phrase in no fewer than three widely separated passages of that document; namely:  pgs xxxvii, 146, and 176, respectively.

Separate and apart from an analysis of the context in which the quoted statement is to be found, there exists a profound difference between the quoted statement and the statement that is now found in connection with the ongoing work of determining what caused the symmetrical, 6.6 second destruction of WTC 7 and quoted above; namely, the quoted statement from page 11 of Information Item No. 1 that completely contradicts the quoted portion of NCSTAR 1.  For purposes of clarity and ease of comparison the two different and mutually contradictory statements are set forth below, one right after the other:

Pg. xxxvii of NCSTAR 1 states:

"NIST found no corroborating evidence for alternative hypotheses suggesting that the WTC towers were brought down by controlled demolition using explosives planted prior to September 11, 2001."

But, Pg. 11 of "Federal Building and Fire Safety Investigation of the World Trade Center Disaster WTC 7 Technical Approach and Status Summary" of December 12, 2006 states, in specifically relevant part:

"While NIST has found no evidence of a blast or controlled demolition event…"

It is seen, therefore, that NIST is making a decidedly different claim now where the previously published concept of no "corroborating evidence" of a certain, specifically limited type of controlled demolition; namely, a controlled demolition

brought about by a highly specific factual subset – explosives planted prior to September 11, 2001 – has been morphed, changed and broadened far beyond what NIST previously said lacked corroboration into a blanket statement that NIST has found no evidence of a blast or controlled demolition event.

That statement is false and must be corrected.

The distinctions here articulated are significant and substantial.  They make a difference.

The statement "corroborating evidence," by definition, indicates there was some evidence of controlled demolition as, indeed, the <10-second, complete, total annihilation of the two WTC towers is, in and of itself, evidence of controlled demolition.  Indeed, NIST, in articulating the lack of "corroborating evidence" also contributed to the present need for correction because, to requester's knowledge, NIST does not reveal the details regarding what evidence there was that was not "corroborated".

NIST, then, should correct NCSTAR 1 by articulating what evidence it had that it could not corroborate.

Thus, this request for correction should be understood to entail, contain and include a request for correction of NCSTAR 1 in conjunction with and as a necessary adjunct to the correction of Information Item No. 1 that pertains to the ongoing investigation of the destruction of WTC 7.

NIST has also plainly acknowledged that it did not investigate what it defined as the "event of collapse" as is plainly admitted in footnote 2 of the Executive Summary of NCSTAR 1 where the following quotation is to be found:

**"The focus of the investigation was on the sequence of events from the instance of aircraft impact to the initiation of collapse for each tower.  For**

**brevity in this report, this sequence is referred to as the "probable collapse sequence," although it does not actually include the structural behavior of the tower after the conditions for collapse initiation were reached and collapse became inevitable."  [See NCSTAR 1, pgs xxxvii, footnote 2 and/or 82, footnote 13]** (Bold emphasis added)

Thus, it is quite clear that had NIST claimed there was "no evidence" of controlled demolition of the WTC towers, NCSTAR 1 would have been criminally fraudulent on its face had it attempted, on one hand, to acknowledge no investigation was done of what occurred during the actual destruction phase of the buildings and then claimed, on the other, that it lacked evidence of what it did not investigate.

Indeed, one reason why NIST could not "corroborate" evidence of controlled demolition is that it did not look for it.  This is something that NIST must now specifically acknowledge so as not to continue misleading the public.

Accordingly, let this request for correction also serve to place NIST on notice that any further refusal by NIST to acknowledge that it cannot rule out the possibility of controlled demolition or otherwise state that it has found no evidence of controlled demolition in a context that suggests that it had looked for and did not find such evidence may be considered as indicative of fraud and of deception.

NIST cannot now state it has found no evidence of controlled demolition because that is decidedly not what it previously stated; and, in any event, having not looked for such evidence in the time and place where it might have been found, NIST must further correct the record.

In furtherance of the burden of proof that I, the affected person, have in this correction request, I hereby state that the ordinary meaning of the words and the phrase "corroborating evidence" as taken from the American Heritage Dictionary where the entry for corroborating states, and I quote: **cor·rob·o·rate** tr.v. **cor·rob·o·rat·ed, cor·rob·o·rat·ing, cor·rob·o·rates**: To strength or support with other evidence, make more certain.  *See Synonyms* at *confirm.*

Strengthen and support with other evidence.  NIST cannot continue on its present fraudulent path.  It is fraud to now say there was no evidence of controlled demolition when NIST previously stated something entirely different.

This conflict in publicly disseminated information compels NIST to issue a correction forthwith.

In its investigation of the destruction of WTC1 and WTC2, NIST failed to explore a controlled demolition hypothesis.  Presumably, NIST did not pursue a controlled demolition hypothesis during its WTC1 and WTC2 investigation because it maintained that it had found no corroborating evidence of a blast or controlled demolition event.  However, NIST claims that it is considering whether hypothetical blast events could have played a role in initiating the destruction of WTC7.  This is suspect and demands correction.  In regard to the WTC7 investigation NIST maintains:

*While NIST has found no evidence of a blast or controlled demolition event, NIST will estimate the magnitude of hypothetical blast scenarios that could have led to the structural failure of one or more critical elements as a result of blast.*

In order to do that, NIST will have to revisit NCSTAR 1 and undertake an analysis of what happened during the 10-second destruction of the twin towers, something it did not previously do.  It cannot reasonably set up hypothetical blast scenarios that disregard what actually happened.

This, then, takes us into a second request for correction, as follows.

CORRECTION REQUEST ISSUE 2

The particular information disseminated that is the subject of this request consists in:

That certain information disseminated as solicitation number SB1341-06-Q-0186, which resulted in the issuance of a fixed price purchase order awarded by the federal government to Applied Research Associates, Inc. (ARA) of Albuquerque, New Mexico in or about March, 2006. (Information Item No. 2)

The source from which requester obtained the information is the NIST web site at the following page: http://wtc.nist.gov/solicitations/

Requester obtained the information from and after December 12, 2006 from the said web page.  It is understood and acknowledged that said information has been disseminated so as to comply with a requirement that contracts awarded to third party contractors may be known to the public and for other reasons, including, by way of example, the ability to request corrections.

Requester submits this request on behalf of himself and other similarly situated persons.  Requester is a citizen of the United States and maintains a web site for the accurate dissemination and propagation of governmental information. Requester's business is in the nature of a research and journalistic organization that has succeeded in providing citizens of the United States with timely information concerning the function and the operation of various governmental agencies that are charged by their enabling legislation, rules and regulations of conducting certain duties in and for the public interest, of which and about which each citizen has a vital interest.

As indicated, this request is to be understood as being submitted by requester in his said capacity and either additionally or alternatively on behalf of other similarly situated persons who are too numerous to quantify or specifically name. Requester is adversely affected by the ongoing threat of promulgation of information that is in need of correction because the present course of action may result in the further concealment of serious wrongdoing.

Specifically, Information Item No. 2 fails to comply with applicable information quality guidelines and standards in a number of particular ways, including, but

not limited to the fact that an inherent and definite conflict of interest arises as a result of the scope of work set out in Information Item No. 2.

The investigation of what caused the destruction of WTC7 has been compromised by the conclusions reached by NIST in its WTC1 and WTC2 investigation conclusions that indicated, as quoted above, and as summarized here, that evidence of controlled demolition could not be corroborated.

A controlled demolition conclusion at WTC7 would indeed challenge the integrity of the WTC1 / WTC2 collapse sequence report.  The fact that many of the same scientists, experts, subcontractors, and associates responsible for the WTC1 / WTC2 conclusions are now working on the WTC7 investigation creates a conflict of interest concern because of inherent pressure to conform the outcome of the investigation of what caused the destruction of WTC 7 to that which they indicated caused the "initiation" of (but not actual destruction of) destruction of WTC 1,2...

In solicitation number SB1341-06-Q-0186 to Applied Research Associates, Inc. it states:

*Research involving human subjects is not permitted under this award unless expressly authorized by in writing by the NIST Contracting Officer.*

Under GSA Contract number GS23F0278M, NIST Order No. SB1341-06-8-0539, as a firm fixed price effort, has been awarded to APPLIED RESEARCH ASSOCIATES, INC. (ARA) of Albuquerque, New Mexico, to append the following tasks to the original contract awarded on March 31, 2006 (SB1341-06-Q-0186). Under the appended tasks, the ARA (1) shall conduct analyses of impact damage and fire effects to provide candidate initiating events, which may lead to structural failures and global collapse, and (2) shall determine if there is any scenario of a hypothetical blast event or events that could have occurred in WTC 7 on September 11, 2001.

This study will reportedly be managed from the Silicon Valley Office of ARA that specializes in finite element analysis and nonlinear structural dynamics under blast and impact loading, impact and penetration mechanics, failure analysis, and blast effects and the analysis of progressive collapse in buildings. ARA is partnering with Simpson Gumpertz & Heger Inc. (SGH) of Waltham, Massachusetts, to conduct the appended tasks, and with Loizeaux Group International (LGI), the consulting services branch of Controlled Demolition Incorporated (CDI) of Phoenix, Maryland.

SGH is an engineering firm that specializes in design, investigation and retrofit of buildings and structures of all types. SGH has expertise in building structures, materials, and investigations and conducted the thermal-structural response analyses of each WTC tower, as part of their contract for the WTC towers investigation.

Loizeaux Group International (LGI) has expertise in a wide range of demolition, explosion and explosives-associated technology. This includes explosive processes and their direct and collateral effects of blast and resulting vibration, projectiles, and overpressure. They have conducted investigations involving commercial explosives, terrorist devices, commercial gas, and industrial accidents involving dusts, hot metals, and combustion processes.

The fact that ARA, SGH, and LGI are prohibited from interviewing human subjects unless expressly authorized in writing by the NIST Contracting Officer calls into question the quality, utility, objectivity, integrity, and transparency of the hypothetical blast scenario research. Indeed, much of the anecdotal information available to me confirms that there are both eyewitnesses to controlled demolition, consisting in people who have made public statements that they either heard and saw explosions and/or heard countdowns and then saw a destruction event that looked, well, controlled. Furthermore, more recently, evidence of controlled demolition has been made public consisting in video footage indicating a major news source, the British Broadcasting Company (BBC), aired a claim that WTC7 had "collapsed" several minutes before it actually did. Indeed, some video indicates a verbal claim of collapse with the building still standing in the background.

It has long been known that a key person, Larry Silverstein, a principal owner of property interests in the World Trade Center complex, indicated, in substance that a decision was made to "pull" – that is – demolish WTC 7.

That key investigators cannot interview such persons, without going through administrative hoops is absurd.  Moreover, in at least one of these instances, advance knowledge that WTC 7 was to be demolished might well lead to criminal charges.  NIST contractors such as ARA, SGH, and LGI are not qualified to conduct criminal investigations or criminal interviews or criminal interrogations.

Thus, not only is there an inherent conflict of interest in that some or all of these same parties were involved in the investigation of WTC1 and WTC2 that could not find "corroborating evidence" of controlled demolition, thus preordaining the same outcome for the WTC7 investigation, there is the possibility these contractors could taint a criminal investigation.

There is yet another problem.

Any evidence of a controlled demolition might, conceivably implicate one or more of the sub-contractors because some of them are entities that have expertise in controlled demolitions.  For example, let us consider Controlled Demolition Inc., or one or more of its employees, past and present, and its subcontractors.  The universe of individuals having the capability to carryout controlled demolition work is somewhat limited.  Such skills are not generally found among the general population.

The range of people who could carryout such demolitions are necessarily limited. Upon information and belief, CDI carries out more than 70% of all controlled demolitions conducted in the US.

It stands to reason that past and present employees of CDI could be parties of interest to any criminal investigator investigating a controlled demolition event at WTC7 because these people clearly possess the technical expertise to "pull" any structure by controlled demolition.

I, as a requester, do not have to elaborate this issue overmuch.  The potential conflict is clear and apparent and cries out for correction.

To continue to allow a hypothetical blast event investigation within the WTC7 investigation, done by the current crop of subcontractors demonstrates a lack of quality, utility, objectivity, integrity, and transparency within the investigation that is clear, apparent and incontrovertible.

NIST, ARA, SGH, and LGI, the consulting branch of CDI, are not qualified to conduct a proper investigation of whether or not a controlled demolition of WTC7 occurred.  The fact that ARA, SGH, and LGI are prohibited from interviewing human subjects unless expressly authorized in writing by the NIST Contracting Officer calls into question the quality, utility, objectivity, integrity, and transparency of the hypothetical blast scenario research in its own right. Moreover, even if they were allowed to do so, or granted permission to do so, another confounding variable exists because those parties should not be permitted to taint a possible criminal investigation.

ARA, SGH, and LGI are not qualified to conduct criminal investigations or criminal interviews or criminal interrogations. Controlled Demolition Inc., its employees past and present, and its subcontractors would be a parties of interest to any criminal investigator investigating a controlled demolition event at WTC7 because these people clearly possess the technical expertise to "pull" any structure by controlled demolition.  From a criminal investigation standpoint, CDI would have to be cleared of suspicion prior to being solicited to assist in the investigation.

NIST, ARA, SGH, and LGI must cease their hypothetical blast scenario investigation forthwith because continuing with it is hopelessly tainted, compromised and damaged, and NIST must acknowledge as much.

By copy of this Correction Request to my counsel, Jerry V. Leaphart of Jerry V. Leaphart and Associates, P.C., I hereby request that he file for an injunction preventing NIST from going forward with any further issuance of any report on

what caused the 6.6 second destruction of WTC 7 pending the resolution of this Correction Request.


Respectfully submitted,


Edward F. Haas


Cc

Jerry V. Leaphart
8 West Street
Suite 203
Danbury, CT 06810

# EXHIBIT D
# NIST RFC RESPONSE 8/22/07


# SEPARATELY ATTACHED

# EXHIBIT E
# AFFIDAVIT

# EXHIBIT F

**The Collapse of World Trade Center 7**

**Allegation**:  *9/11 Revealed* suggests that the 47-story World Trade Center 7 building, which collapsed at 5:20 pm on September 11, was intentionally demolished.  The primary piece of evidence for this is a comment that Mr. Larry Silverstein, who owned the World Trade Center complex, made on the September 2002 television documentary *American Rebuilds*.  Mr. Silverstein said:

I remember getting a call from the Fire Department commander, telling me they were not sure they were going to be able to contain the fire.  I said, you know, "We've had such terrible loss of life that the smartest thing to do is just pull it."  And they made that decision to pull it and we watched the [World Trade Center 7] building collapse.

*9/11 Revealed* and other conspiracy theorists put forward the notion that Mr. Silverstein's suggestion to "pull it" is slang for intentionally demolishing the WTC 7 building.

**Facts** :  On September 9, 2005, Mr. Dara McQuillan, a spokesman for Silverstein Properties, issued the following statement on this issue:

> Seven World Trade Center collapsed at 5:20 p.m. on September 11, 2001, after burning for seven hours. There were no casualties, thanks to the heroism of the Fire Department and the work of Silverstein Properties employees who evacuated tenants from the building.

> The Federal Emergency Management Agency (FEMA) conducted a thorough investigation of the collapse of all the World Trade Center buildings.  The FEMA report concluded that the collapse of Seven World Trade Center was a direct result of fires triggered by debris from the collapse of WTC Tower 1.

> In the afternoon of September 11, Mr. Silverstein spoke to the Fire Department Commander on site at Seven World Trade Center.  The Commander told Mr. Silverstein that there were several firefighters in the building working to contain the fires.  Mr. Silverstein expressed his view that the most important thing was to protect the safety of those firefighters, including, if necessary, to have them withdraw from the building.

> Later in the day, the Fire Commander ordered his firefighters out of the building and at 5:20 p.m. the building collapsed.  No lives were lost at Seven World Trade Center on September 11, 2001.

As noted above, when Mr. Silverstein was recounting these events for a television documentary he stated, "I said, you know, we've had such terrible loss of life. Maybe the smartest thing to do is to pull it." Mr. McQuillan has stated that by "it," Mr. Silverstein meant the contingent of firefighters remaining in the building.

The National Institute of Standards and Technology has stated unequivocally, "NIST has seen so evidence that the collapse of WTC 7 was caused by bombs, missiles, or controlled demolition," in its *Collapse of WTC 7* report (p. 6). NIST's working hypothesis for the collapse of WTC 7 is that it was caused by the collapse of a critical column due to "fire and/or debris induced structural damage." There was substantial damage to WTC 7 when the nearby WTC 1 tower collapsed and fires began shortly afterwards. Also, WTC 7 was a very unusual building because it was built over an existing Con-Edison power generation substation, which contained two large 6,000 gallon fuel tanks for the emergency generation of power. The fuel from these tanks could have contributed to the intense heat that apparently weakened the supporting columns in WTC 7.

# EXHIBIT G

AMERICANS FOR SAFE ACCESS, Plaintiff, v. The U.S. DEPARTMENTOF HEALTH AND HUMAN SERVICES, and the U.S. FOOD AND DRUG ADMINISTRATION,Defendants.

No. C 07-01049 WHA

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OFCALIFORNIA

2007 U.S. Dist. LEXIS 89257

November 20, 2007, Decided
November 20, 2007, Filed

CORE TERMS: guidelines, agency action, correction, hhs, legally required, agency decisions, calendar, marijuana, unreasonably delayed, information-correction, reconsideration, disseminated, reviewable, failure to state a claim, unlawfully, timeliness, compelled, withheld, specify, inform, Information Quality Act, time periods, corrective action, leave to amend, judicial review, infoquality, discrete, advisory, shtml, http

COUNSEL: [*1]For Americans for Safe Access, Plaintiff: Joseph D. Elford, LEAD ATTORNEY, Americans for Safe Access, Oakland, CA.

For Department of Health and Human Services, Food and Drug Administration, Defendants: Steven Yale Bressler, LEAD ATTORNEY, U.S. Department of Justice, Civil Division, Federal Programs Branch, Washington, DC.

JUDGES: WILLIAM ALSUP, UNITED STATES DISTRICT JUDGE.

OPINION BY: WILLIAM ALSUP

OPINION

ORDER GRANTING MOTION TO DISMISS

INTRODUCTION

In this Administrative Procedure Act action, plaintiff Americans for Safe Access seeks to compel the United States Department of Health and Human Services to provide a "substantive" response to its petition to correct statements regarding the accepted medical use and efficacy of marijuana. Plaintiff filed its first amended complaint on August 17, 2007.

On motion to dismiss pursuant to *Rule 12(b)(6)*, this order addresses the following two questions: (1) What constitutes an "agency action" under *5 U.S.C. 706(1)*, the provision of the APA which allows a court to "compel agency action unlawfully withheld or

unreasonably delayed," and (2) Is adherence to guidelines promulgated under the requirements of the Information Quality Act legally required? This order finds that it is [*2]not necessary to reach a conclusion as to the first question because plaintiff has not shown that the action it seeks to compel is legally required. This order therefore GRANTS defendants' motion to dismiss.

STATEMENT

The Information Quality Act of 2000 directed the Office of Management and Budget to issue guidelines "that provide policy and procedural guidance to Federal agencies for ensuring and maximizing the quality, objectivity, utility, and integrity of information disseminated by Federal agencies . . . ." Pub. L. No. 105-554 § 1(1)(3) [Title V. § 515] (Dec. 21, 2000) (published at *44 U.S.C. 3516* note 4(a)). The IQA directed OMB to include the following provisions in its guidelines: (1) that federal agencies issue their own guidelines not more than one year after OMB issues its guidelines; (2) that agencies "establish administrative mechanisms allowing affected person to seek and obtain correction of information maintained and disseminated by the agency that does not comply with [the OMB guidelines];" and (3) that agencies periodically report to the director of OMB the nature and number of complaints and how they were handled. See *44 U.S.C. 3516* note 4(b)(2).

The OMB guidelines, [*3]finalized on February 22, 2002, stated the following as to information-correction procedures:

To facilitate public review, agencies shall establish administrative mechanisms allowing affected persons to seek and obtain, where appropriate, timely correction of information maintained and disseminated by the agency that does not comply with OMB or agency guidelines. These administrative mechanisms

shall be flexible, appropriate to the nature and timeliness of the disseminated information, and incorporated into agency information resources management and administrative practices.

i. Agencies shall specify appropriate time periods for agency decisions on whether and how to correct the information, and agencies shall notify the affected persons of the corrections made.

ii. If the person who requested the correction does not agree with the agency's decision (including the corrective action, if any), the person may file for reconsideration within the agency. The agency shall establish an administrative appeal process to review the agency's initial decision, and specify appropriate time limits in which to resolve such requests for reconsideration.

*67 Fed. Reg. at 8459.*

On October 1, 2002, pursuant [*4]to the IQA and the OMB guidelines, the United States Department of Health and Human Services implemented its own guidelines. The HHS guidelines established an information-correction procedure as follows:

Based on a review of the information provided, the agency will determine whether a correction is warranted and if so, what action to take. The agency will respond to the requestor by letter or e-mail. The agency's response will explain the findings of the review and the actions that the agency will take, if any. The response will consider the nature and timeliness of the information involved and such factors as the significance of the correction on the use of the information, the magnitude of the correction and the resource requirements for the correction. The response will describe how the complainant may request reconsideration. The agency will respond to all requests for correction within 60 calendar days of receipt.

If the request requires more than 60 calendar days to resolve, the agency will inform the complainant that more time is required and indicate the reason why and an estimated decision date.

If the individual submitting the complaint does not agree with the agency's decision [*5](including the corrective action), the complainant may send a written hard copy or electronic request for reconsideration within 30 days of receipt of the agency's decision. The appeal shall state the reasons why the agency response is insufficient or inadequate. Complainants shall attach a copy of their original request and the agency response to it, clearly mark the appeal with the words, " Information Quality Appeal," and send the appeal to the specific agency appeals address.

The agency official who handles the original complaint will not have responsibility for resolving the appeal. The agency will respond to all requests for appeals within 60 calendar days of receipt. If the request requires more than 60 calendar days to resolve, the agency will inform the complainant that more time is required and indicate the reason why and an estimated decision date.

http://aspe.hhs.gov/infoquality/Guidelines/index.shtml.

Plaintiff filed an information- correction request with HHS on October 4, 2004, asking HHS to correct information it was disseminating about the medical use of marijuana (Compl. P 15). Specifically, plaintiff disagrees with defendants' statements that marijuana "has no currently [*6]accepted medical use in treatment in the United States" (Compl. P 1). HHS responded on December 1, 2004, stating that it needed to consult with the Drug Enforcement Administration, which was contemporaneously reviewing a petition to reschedule marijuana, in order to provide a

response. Plaintiff protested this response as inexcusable delay, but HHS nevertheless continued to state that it needed more time to coordinate agency review (Compl. PP 18-19). On April 20, 2005, HHS denied plaintiff's information-correct petition, and plaintiff appealed on May 19, 2005. Subsequently, HHS made a series of interim responses noting that the process was still ongoing, and on July 12, 2006, noted that it anticipated providing a response by September 2006 in connection with a marijuana rescheduling petition pending before the DEA. According to plaintiff, this marked the conclusion of the administrative IQA petition process, as plaintiff was left without additional avenues of recourse (Compl. PP 19-22)).

Plaintiff filed suit on February 21, 2007, seeking declaratory and injunctive relief under the Administrative Procedure Act. On July 24, 2007, this Court granted defendants' motion to dismiss the original [*7]complaint for failure to state a claim under *Rule 12(b)(6)*, but granted plaintiff leave to amend to proceed on a theory that defendants unlawfully withheld or delayed agency action by not providing a substantive response to plaintiff's information-correction petition. Plaintiff did so amend its complaint, and filed its amended complaint on August 17, 2007. Defendants then filed a second motion to dismiss under *Rule 12(b)(6)* on October 11, 2007.

ANALYSIS

1. "FINAL" AGENCY ACTION UNDER SECTION 706(1).

The APA allows judicial review of federal agency action that is either "made reviewable by statute [or] final agency action for which there is no other adequate remedy in a court." *5 U.S.C. 704*. It also directs the reviewing court to "compel agency action unlawfully withheld or unreasonably delayed." *5 U.S.C. 706(1)*. A

claim under *Section 706(1)* "can proceed only where a plaintiff asserts that an agency failed to take a discrete agency action that it is required to take." *Norton v. Southern Utah Wilderness Alliance, 542 U.S. 55, 64, 124 S. Ct. 2373, 159 L. Ed. 2d 137 (2004)*.

Plaintiff argues that an action under *Section 706(1)* only needs to be a "discrete" action, not a "final agency action," stating that "courts have routinely [*8]entertained suits under the APA for denials of administrative petitions" (Opp. 11). Plaintiff cites numerous cases on this point, all of which are similarly unhelpful inasmuch as they all address final agency actions.

Defendants, however, note several decisions, including two district court decisions within the Ninth Circuit that have squarely addressed this question and have held that *Section 706(1)* requires that the action sought to be compelled must be final agency action. See *Elhaouat v. Mueller, 2007 U.S. Dist. LEXIS 58906, 2007 WL 2332488 at *3 (E.D. Penn., Aug. 9, 2007)*; *High Sierra Hikers Ass'n v. United States Forest Serv., 436 F. Supp. 2d 1117, 1140 (E.D. Cal., June 8, 2006)*; *Friends of Yosemite Valley v. Scarlett, 439 F. Supp. 2d 1074, 1086 (E.D. Cal., July 19, 2006)*. Ultimately it is not necessary for this order to rule on the question because plaintiff fails to meet the second requirement under *Section 706(1)*; that the action to be compelled is legally required.

2. ACTION LEGALLY REQUIRED.

"[T]he only action that can be compelled under the APA is action legally required." *Norton, 542 U.S. at 63*. In this case, plaintiff argues that defendants have unreasonably delayed in making a substantive response, [*9]but a delay "cannot be unreasonable with respect to action that is not required." *Id. at 63 n.1*. Plaintiff argues that the language in the IQA, which directs the OMB to issue guidelines that would "require" agencies to issue their own guidelines that would allow "affected persons to seek and obtain correction of information" creates a legal requirement (Opp. 12) (quoting *67 Fed. Reg. 8452, 8459 (Feb. 22, 2003)*). Furthermore, plaintiff notes that the OMB guidelines state that agencies "shall specify appropriate time periods for agency decisions." Ibid. As stated above, the HHS guidelines direct the agency to respond to requests for correction and appeals within sixty days.

Defendants rely on *Salt Institute v. Leavitt, 440 F.3d 156, 159 (4th Cir. 2006)*, in which the Fourth Circuit held that the IQA "creates no legal rights in any third parties." Defendants further argue that the HHS guidelines do not impose a strict deadline because they only state that "[t]he agency will respond to all requests for correction within 60 calendar days of receipt," and if the requests requires more than 60 days, the agency "will inform the complainant that more time is required and indicate the reason why." [*10]http://aspe.hhs.gov/infoquality/Guidelines /index.shtml. Plaintiff does not dispute that defendants did respond but, instead, argues that defendants' response amounted to a "nonsubstantive final denial" (Compl. P 22).

Defendants also contend that the OMB guidelines do not mandate a substantive response, but instead "underscore the 'flexibility' that the guidelines give the agencies" (Reply 16). Guidelines are by nature advisory, but the Ninth Circuit has recognized that "[a]n agency's regulations may create judicially enforceable duties." *Lowry v. Barnhart, 329 F.3d 1019, 1022 (9th Cir. 2003)* (emphasis added). In *Salt Institute v. Thompson, 345 F. Supp. 2d 589, 602 (E.D. Va., Nov. 15, 2004)*, however, Judge Gerald Lee considered whether an agency's actions under the IQA and the OMB guidelines were judicially reviewable and stated that "[a]gency

dissemination of advisory information that has no legal impact has consistently been found inadequate to constitute final agency action and thus is unreviewable by federal courts under the APA." That decision held that "neither the IQA nor the OMB Guidelines provide judicially manageable standards that would allow meaningful judicial review to [*11]determine whether an agency properly exercised its discretion in deciding a request to correct a prior communication." Ibid. The OMB guidelines give discretion to agencies by stating that "agencies, in making their determination of whether or not to correct information, may reject claims made in bad faith or without justification, and are required to undertake only the degree of correction that they conclude is appropriate for the nature and timeliness of the information involved." *67 Fed. Reg. at 8458*.

In addition to the holding in Salt Institute, other courts have held similar language to allow discretion on the part of agencies, and render action not legally required. See *Steenholdt v. FAA, 354 U.S. App. D.C. 192, 314 F.3d 633, 638 (D.C. Cir. 2003)* (regulations allowing rescission of a designation for any reason the administration considers appropriate not judicially reviewable).

This order agrees that the IQA and OMB guidelines do not create a duty to perform legally required actions that are judicially reviewable. Since plaintiff has not shown that the action it seeks to compel is legally required, defendants' motion to dismiss for failure to state a claim must be GRANTED.

CONCLUSION

Plaintiff has failed [*12]to show that defendants have unreasonably delayed the performance of a legally required duty. For the above reasons, defendants' motion to dismiss

for failure to state a claim pursuant to *Rule 12(b)(6)* is hereby GRANTED. Further leave to amend is unwarranted. The Clerk shall close the file.

IT IS SO ORDERED.

Dated: November 20, 2007.

/s/ William Alsup

WILLIAM ALSUP

UNITED STATES DISTRICT JUDGE